# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

B.D., through his parents Yvonne Heffner and Steve
Jones, and Yvonne Heffner and Steve Jones,
individually,

                     Plaintiffs,

     v.

Fairfax County School Board,
                     Defendant.

Civil Action No. 18-cv-1425

## COMPLAINT

B.D., Yvonne Heffner, and Steve Jones, by and through their attorneys at Williams &

Connolly LLP, allege and state as follows:

### PRELIMINARY STATEMENT

1.     This action is brought on behalf of B.D. (the "Student") by Yvonne Heffner and

Steve Jones ("Parents") and by Ms. Heffner and Mr. Jones as individuals (collectively,

"Plaintiffs").  B.D. is an 18-year-old student in the 12th grade attending George C. Marshall

High School ("Marshall").  Marshall is part of the Fairfax County Public Schools ("FCPS"),

which is operated by Defendant Fairfax County School Board.  The Student is a capable,

intellectually curious teenager, who loves dancing, music, and sports.  He is extremely hard-

working at school, at work, and at home.  He is motivated to learn and has a strong drive to

succeed academically.  B.D., however, has been diagnosed with Down syndrome—a condition

he has had since birth.  He has been identified as intellectually disabled ("ID") and has, since 2nd

grade, received special education and related services from FCPS pursuant to an Individualized

Education Plan ("IEP").  B.D.'s ultimate goal, shared by his Parents and (at one point) the school

division, is that he will graduate high school with a Standard Diploma that reflects his knowledge and mastery of the academic curriculum.

2.      B.D. has attended Marshall High School since 2015.  On December 7, 2015, B.D.'s special education team at Marshall—including B.D.'s Parents, B.D.'s Special Education teachers, Marshall's principal, Marshall's Department Chair of Special Education, an education specialist from FCPS, and FCPS's Coordinator for Adapted Curriculum—met with his Parents and created B.D.'s current IEP ("2015 IEP").  This 2015 IEP, which remains in effect today, laid out B.D.'s current levels of performance and set specific annual goals and short-term objectives. The document acknowledged B.D.'s challenges and unique needs, but it also laid out B.D.'s strengths and the growth B.D. had achieved in middle school.  With the proper support, the IEP acknowledged that B.D. would be able to access the general education curriculum in math, reading, and writing, and that he would be on track for a Standard Diploma.  The IEP stipulated that B.D. would be provided with numerous accommodations that would allow him to achieve his IEP goals and access the curriculum, including use of an assignment notebook, teacher help after school to ensure completion of assignments and understanding of content, assistive technology, flexible schedules, visual aids such as graphic organizers, read-aloud instructions and questions, math aids such as a calculator, and shortened assignments.  The IEP required twenty hours of Special Education services per week and an additional seven hours of related services per month.  The IEP also indicated, consistent with the agreed-upon goals, that B.D. was on the Standard Diploma track and would take the Virginia Standards of Learning ("SOL") tests—Virginia's high-stakes, standardized tests—with accommodations.  The IEP briefly listed notes from teacher interviews with B.D. regarding his thoughts on his interests and possible vocations for after graduation.

3.      When B.D.'s IEP team created the 2015 IEP, B.D. had demonstrated significant academic progress in reading, writing, and math during his time in middle school.  In math, he was already capable of solving addition problems and two-step equations with little assistance; in reading, he was able to independently read a text and pinpoint a story's main idea and supporting details, as well as answer basic comprehension questions; and in writing, B.D. had already exhibited facility with using graphic organizers and brainstorming techniques to write independently.  The goals recited in B.D.'s 2015 IEP were reasonably calculated based on B.D.'s demonstrated progress and potential as of that time.  The IEP team noted in 2015 that the school would provide B.D. with the various supports and accommodations recited above.

4.      Over the course of the following three years, however, B.D. made almost no progress or regressed in the areas of math, reading, writing, and speech and language.  Instead of providing the required educational services and accommodations recited in B.D.'s IEP, his school let him languish in classrooms that were not rigorous where, instead of receiving academic supports and accommodations, B.D. was often "babysat" and allowed to watch videos on YouTube.  The school did not meaningfully track B.D.'s progress towards his IEP goals, and B.D.'s parents received little to no clear evidence of B.D.'s progress or indicators of B.D.'s growth

5.      B.D. fell prey to a culture of low expectations set for him at Marshall.  Indeed, the school's expectations for B.D. declined over time: for example, instead of providing B.D. with new IEP goals each year that would foster his growth, the school sought to *lower* his goals in several IEPs that the school has proposed since 2015 (the "Proposed IEPs").  For this reason, the IEP team (including B.D.'s parents) have not agreed to a new IEP since the December 2015 IEP, which has become known as the "Stay Put" IEP.  Instead of accepting its responsibility to

provide B.D. with a Free Appropriate Public Education ("FAPE") in the Least Restrictive Environment, FCPS has abdicated that responsibility.

6.      FCPS's failure is particularly troubling because, throughout the last three years, B.D.'s parents have continuously sought to ensure that B.D. receives the supports and accommodations that he is entitled to receive under the law.  They have corresponded and visited with teachers, administrators, school board members and Central Office Staff—including the Assistant Regional Superintendent and the Assistant Superintendent—to no avail.  FCPS has largely ignored or brushed aside B.D.'s parents' requests to implement B.D.'s IEP in good faith, and has ignored their requests to implement new goals that would facilitate B.D.'s progress. Marshall's principal even blocked B.D.'s parents from communicating directly with B.D.'s teachers and other school staff, further obstructing their efforts to hold the school accountable for its failure to implement B.D.'s IEP.  It was only after these repeated efforts that B.D.'s parents filed a Due Process Complaint against FCPS for its failure to provide B.D. with FAPE under the Individuals with Disabilities Education Act (IDEA).

7.      B.D.'s parents pursued their Due Process hearing against the school division *pro se*.  The hearing occurred before a Hearing Officer who has been involved with numerous cases brought by parents against FCPS.  Unfamiliar with the intricacies of legal proceedings, B.D.'s parents had difficulty presenting their claims and evidence during the hearing and were outmatched by FCPS's legal counsel, which has participated in dozens of these hearings, including multiple hearings before the very same Hearing Officer.  The Hearing Officer, unsurprisingly, adopted the positions of FCPS and denied the Parents' claims.  In the process, the Hearing Officer disregarded the testimony of B.D.'s parents and of the educational experts they relied upon.  For example, the Hearing Officer asserted that one of the Parent's expert's

testimony was not entitled to meaningful weight despite his extensive credentials as a Ph.D. and

Licensed Clinical Psychologist.  Nonetheless, the disregarded testimony underscored FCPS's

failure to faithfully implement B.D.'s IEP and provide him with adequate supports to attain

appropriate educational growth and the opportunity to graduate with a Standard Diploma.

Perhaps recognizing the school division's failure, the Hearing Officer also inappropriately

awarded FCPS relief by holding that FCPS's Proposed IEPs all provided FAPE—an issue that

was never raised by the Parents.

8.     Now B.D. and his Parents bring this suit under the IDEA to appeal the Hearing

Officer's Decision.  The Decision is fatally flawed—both legally and factually.

9.     Plaintiffs also bring claims for discrimination and retaliation under the Americans

with Disabilities Act and Section 504 of the Rehabilitation Act.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because

this case raises federal questions under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400, *et seq*., Section 504 of the Rehabilitation Act ("Section 504"), 29

U.S.C. § 700, *et seq*, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12132.

11.     Plaintiffs have exhausted their administrative remedies where required under 20

U.S.C. § 1415(i) by timely pursuing a Special Education Due Process hearing.  The Due Process

decision was issued by the State educational agency on August 19, 2018, and Plaintiffs have

initiated this action within 90 days of that decision.

12.     Defendant resides in the Eastern District of Virginia.  Additionally, Defendant's

actions regarding this matter have taken place entirely within the jurisdiction of the United States

District Court for the Eastern District of Virginia.  Venue is appropriate in this District under 28 U.S.C. § 1391(b).

## PARTIES

13.     Plaintiffs Yvonne Heffner and Steve Jones sue individually and on behalf of their son, B.D., a student currently attending Marshall High School within Fairfax County Public Schools.  B.D. has been diagnosed with Down syndrome and is classified with an intellectual disability ("ID").  B.D. is eligible to receive services under the Individuals with Disabilities Education Act.  B.D. is also a "qualified individual with a disability," as defined by Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act.

14.     Plaintiffs appeal from a decision of a Virginia Special Education Hearing Officer ("Decision"), issued on August 19, 2018 and attached as Exhibit 1.

15.     Defendant Fairfax County Public School Board is a local education agency under the IDEA, 20 U.S.C. § 1401(19)(A), a recipient of federal funds subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b)(2)(B), and a "public entity" subject to Title II of the ADA 42 U.S.C. § 12131(1).

## FACTS

16.      B.D. is an eighteen-year-old 12th grade student attending Marshall High School in the Fairfax County Public Schools district.  For his entire educational career, B.D. has had a Down syndrome diagnosis and received special education and related services.  In elementary school, he was categorized as having an Intellectual Disability ("ID").  In order to provide special education services to B.D., the IDEA requires that the school and B.D.'s parents develop an IEP designed to facilitate appropriate academic growth and achievement based on B.D.'s specific needs.

17.     B.D.'s individualized needs are unique when compared to other students with a similar diagnosis.  He is high-functioning and capable in school, work, and at home.  In school, B.D. is hard-working and motivated to succeed.  Before arriving at Marshall, B.D. had been making steady progress in math, reading, and writing.  The personal drive that enabled B.D. to achieve that progress stayed with him through his time at Marshall.  During the Due Process Hearing all of his high school teachers testified that B.D. was determined and able to focus on schoolwork for long periods of time.

18.     B.D. has many academic strengths in addition to being a hard-worker.  Teachers describe him as intellectually curious and eager to learn new skills.  Reading is a relative strength for B.D., and he presents similar decoding and recognition skills as his peers.  In math, B.D. performs with a mild deficiency compared to his peers when provided with a calculator.  Writing is a relative weakness for B.D., but he has shown promise in his writing ability with the use of graphic organizers and assistive technology.

19.     B.D., his parents, and the school division developed a goal that B.D. would graduate with a Standard Diploma.[1]  This goal was repeated in B.D.'s December 2015 IEP, and had been initially set in 2013, when B.D. was in 7th grade.  His IEP teams—full of professionals with years of experience—have continued to set the Standard Diploma as an appropriate goal for B.D.

20.     B.D. also has a job outside of school.  He is currently employed as a busboy at a local Outback Steakhouse, and at that job, he demonstrates his ability to quickly learn and excel at vocational tasks.

---

[1] This is an achievable goal for many students with Down syndrome that are high-functioning.  *See* Perry Stein, *One sibling had Down syndrome, the other didn't. They both graduated, and now they're off to college*, Wash. Post, June 14, 2016, https://www.washingtonpost.com/local/education/one-sibling-had-down-syndrome-the-other-didnt-they-both-graduated-and-now-theyre-off-to-college/2016/06/14/bc3d30e1-9516-482a-a8db-af1da47634b5_story.html.

21.     At home, B.D. performs regular chores including cutting the grass, vacuuming, doing laundry, taking out the trash, and washing dishes.  He is fully responsible for taking care of the family dog.  He enjoys spending time with his parents and his siblings, a younger brother and an older sister.

22.     B.D. lives a vibrant and full life.  He loves sports, and plays basketball in a local recreational league for non-disabled high school students.  He is an excellent player and during one game made five straight three-point shots in the fourth quarter.  He also is the manager of the varsity basketball team at Marshall.  In that capacity he has earned the respect of the coaches and his peers, who attended the game where B.D. shot lights out in the fourth quarter.  B.D. is a fun-loving teen, who enjoys singing and dancing to his favorite artists, specifically Justin Bieber (do not judge him on his taste in music!).

23.     In 2015, B.D. entered Marshall High School as a freshman.  The IEP in place at that time (as adopted by a team of nearly a dozen education professionals) had been developed at B.D.'s middle school.  That middle school IEP had indicated B.D.'s progress in achieving several academic goals, including goals in math, reading, and writing.  The math goals focused on higher-level word problems and manipulating currency; the reading goals focused on growing his reading level by increasing B.D.'s comprehension through the use of graphic organizers; and the writing goal focused on providing B.D. strategies so that he could write reports with more clarity.  These goals were reasonable and consistent with B.D.'s academic abilities at that time.  During the middle school IEP meeting, the team discussed reading interventions for B.D. that would enable him to continue his reading growth.  The team discussed specific programs such as Language! And Language Alive! and created a high school schedule for B.D. that included a full class period of Developmental Reading.  The middle school IEP acknowledged that B.D. needed

heavy support to make appropriate growth in reading.  It was only natural that the high school

IEP developed at Marshall would continue along the same trajectory as B.D.'s middle school

IEP, and that the services and accommodations recited in this new IEP would be designed to

allow B.D. to achieve his goals.

24.     A large team including B.D.'s parents and another dozen or so education

professionals finalized B.D.'s high school IEP on December 7, 2015.  The team in attendance at

Marshall included B.D.'s Special Education Teachers, Sara Sotoudeh and Sarah Willis.  Ms.

Sotoudeh was B.D.'s math teacher at the time, and Ms. Willis was teaching him reading and

writing.  Also in attendance was Jeffrey Litz, Marshall's principal; Jugnu Agrawal, an FCPS

educational specialist; Eleanor Slack, FCPS's Coordinator for Adapted Curriculum; Ellen Reed,

Marshall's Special Education Department Chair; and Madonna Aldrich, Marshall's Procedural

Support Liaison.  This team agreed that B.D. was a capable student, affirming in his December

2015 IEP that B.D. was capable of continuing his academic growth.  The IEP stated that B.D.'s

math skills were between the 2nd and 3rd grade and that he could independently perform

addition, with and without regrouping, as well as solving two-step equations.  In reading, the IEP

affirmed that B.D. was on about a 3rd grade level.  And in writing, the IEP stated that B.D.'s

writing skills had improved, especially when given access to accommodations, such as using the

computer program "Write Out Loud" that repeats B.D.'s writing back to him and prewriting with

graphic organizers to organize his thoughts.

25.     The IEP team also agreed that numerous accommodations and services would be

needed to provide B.D. with FAPE.  The accommodations included instructional supports such

as assistive technology, graphic organizers, and structured class time.  Also included were

accommodations that would allow B.D. to perform his work to his full abilities such as extended

time and short breaks during assignments, having questions and instructions read aloud, using a

number line and a calculator during math, and shortened assignments.  Acknowledging B.D.'s

unique needs, the team also provided that he would be given preferential seating.  Finally, to

ensure that B.D. could track his assignments and exams, his teachers were required to fill out an

assignment notebook—B.D.'s parents discovered that the school staff rarely complied with this

requirement

26.     B.D.'s IEP also required Marshall to provide significant services to B.D. each

week.  These services included fourteen hours per week of learning disability support with all of

that support occurring in a Special Education setting—as opposed to inclusion, which takes place

in a general education setting.  The learning disability classes are expected to teach the general

education curriculum while including the necessary learning supports to achieve progress

towards IEP goals and state standards. Therefore, by taking these classes, B.D. should have been

able to take the SOLs.  Additionally, the IEP included six hours per week of intellectual

disability support—also fully in a Special Education setting.  Lastly, the IEP included related

services of one hour per month of occupational therapy and six hours per month of speech and

language services.  For his electives, such as Physical Education and Choir, B.D. was in a fully

inclusive, general education setting.  In the December 2015 IEP, the team also agreed that B.D.

was capable of receiving a Standard Diploma[2] from Marshall and that he would be capable of

receiving that diploma without credit accommodations.

27.     Unfortunately, Marshall has failed to implement B.D.'s December 2015 IEP

throughout his tenure at the school.  The December 2015 IEP remains the only IEP in force

because FCPS was unwilling to create new, appropriate IEPs that facilitated B.D.'s progress

---

[2] A Standard Diploma is the typical path to graduation in Virginia for both disabled and non-disabled students.

towards goals and advancement from grade to grade.  Instead, FCPS proposed nine amended IEPs ("Proposed IEPs") between 2016 and 2018 that were regressive, ratcheting back B.D.'s goals and lowering expectations to levels that would have been unfathomable in 2015.  B.D.'s parents could not in good conscience sign any of the Proposed IEPs because they were simply not rigorous enough to allow B.D. to make even the most basic progress toward B.D.'s reasonable goal of earning a Standard Diploma, let alone the numerous math, reading, writing, and other subgoals that were recited in the December 2015 IEP.  These new proposed IEPs, therefore, did not address B.D.'s individualized needs, were not calculated to ensure his reasonable academic progress, and were simply an effort to justify FCPS's apparent failure to implement the December 2015 IEP and provide B.D. with the services and supports necessary to ensure FAPE.

28.     In sum, in the almost three years since the December 2015 IEP was finalized, FCPS has continually failed to provide B.D. the appropriate educational opportunities, services, and accommodations necessary to meet the goals laid out in that IEP.  Consequently, B.D. has not adequately progressed, and in some areas he has regressed.

29.     The December 2015 IEP establishes B.D.'s baseline achievement levels for his time at Marshall, along with the appropriate progress that B.D. should have achieved in relation to those goals.

30.     Additionally, the December 2015 IEP states that B.D. is on a Standard Diploma track.  As of 2015, B.D. was on that track, but B.D. has not been provided with meaningful opportunities to progress toward that goal, let alone his individual IEP goals.  This is discussed in the paragraphs that follow.

*Math Baseline, Goals, and Progress*

31.     In Math, the December 2015 IEP states that B.D. "is able to independently solve addition problems, with and without regrouping, without the use of a calculator.  [B.D.] also applies orders of operations and solves two-step equations with little to no assistance."  This baseline was determined based on anecdotal data and a mathematics benchmark test called the Brigance assessment.

32.     From this baseline, the December 2015 IEP created two annual math goals with corresponding short term objectives.  The first annual goal is that B.D. "will solve multi-step computational problems and word problems involving whole numbers, fractions, percentages, and decimals . . . with at least 70% accuracy."  Some short-term objectives to help him reach that goal include: (1) independently calculating four digit minus four digit numbers with regrouping with 75 percent accuracy; (2) independently calculating two digits times two digits with regrouping with 75 percent accuracy; (3) independently calculating four digits divided by one digit, with a remainder with 75 percent accuracy; and (4) independently calculating four digits divided by two digits with a remainder with 75 percent accuracy.

33.     The second annual Math goal is that B.D. will "solve subtraction, multiplication, and division problems, as well as 'real life' word problems, using currency."  To help him meet that goal, B.D.'s short term objectives include: (1) counting currency up to $20.00; (2) using subtraction with regrouping to "make change;" and (3) using currency of increasing values to solve multiplication and division problems.

34.     Progress toward these annual goals was to be measured through classroom participation, classwork, and tests and quizzes.  FCPS was also required to send regular Progress Reports home to track B.D.'s progress towards his short term objectives and annual goals.

B.D.'s teachers were also required to perform two Brigance math assessments per year to track his growth.

35.     After almost three years, the most recent data shows that B.D. has made almost no progress towards these annual goals.  In fact, he has achieved very few, if any, of the short term objectives.  This unfortunately is not surprising given the failure to implement B.D.'s IEP.  During the Hearing, his math teacher, Ms. Sotoudeh, acknowledged that she chose not work on his annual goals.  Also, B.D., his private tutor,[3] and his parents were unable to track his math assignments because his teachers did not fill out B.D.'s assignment notebook as required in his IEP.  FCPS did not properly track progress toward B.D.'s math goals as required by the December 2015 IEP.  The school did not perform Brigance assessments in math beyond B.D.'s freshman year, even though these tests are required twice a year.  And to the extent FCPS sent out quarterly progress reports between 2015-2018, those reports did not provide concrete data, and they often conceded that B.D.'s teachers sometimes had not attempted to implement B.D.'s IEP goals at all.  Other times, B.D.'s progress regressed from one report to the next.  Those progress reports did not include any meaningful data to demonstrate B.D.'s growth.  Instead, they just included general statements, even though the December 2015 IEP goals required work samples, quizzes, and tests to measure progress toward the goals and objectives.

36.     On June 22, 2017, FCPS created a Proposed IEP that demonstrated B.D.'s lack of growth at Marshall.  The June 2017 Proposed IEP establishes that B.D. had not made meaningful progress in either of his math goals from the December 2015 IEP.  The IEP confirms that B.D. had yet to even achieve the short term objectives from December 2015..

---

[3] B.D.'s parents were forced to hire a private tutor due to FCPS' denial of FAPE as they attempted to correct for the services FCPS was not providing.

37.     On November 24, 2017, an Educational Evaluation was prepared at the request of Ms. Heffner.  This Assessment further demonstrates B.D.'s lack of growth.  In fact, B.D. regressed.  In the December 2015 IEP, the school stated B.D.'s math grade level of between 2nd and 3rd grade.  Yet, based on the November 2017 Educational Assessment, B.D.'s overall math skills were at a 1.9 grade level—a clear regression.  This regression was the product of Marshall's failure to provide FAPE to B.D.  The school failed to provide the accommodations required in the IEP and failed to meaningfully track B.D.'s progress.

38.     Despite this clear evidence of regression and a lack of growth, the Hearing Officer found that B.D. had "consistently made meaningful progress" in Math.  Decision Ex. 1, at 16. The Hearing Officer relied on the June 2017 IEP and teacher testimony to reach her conclusion. She did not consider the November 2017 Educational Assessment.  The Hearing Officer primarily relied on the testimony of Ms. Sotoudeh, who taught B.D. math his freshman year and was present at the December 2015 IEP meeting.  In explaining how she has seen B.D. make progress over the years, Ms. Sotoudeh claimed that B.D.'s baseline from 2015 was that he was unable to complete one digit addition.  Decision Ex. 1, at 16.  Yet, the December 2015 IEP, which Ms. Sotoudeh signed, clearly states that B.D. had mastered addition with regrouping prior to his freshman year.  The Hearing Officer failed to address this glaring inconsistency.  Also, the hearing officer failed to address FCPS's gross failure to meaningfully implement any of the accommodations or services recited in B.D.'s IEP.

*Reading Baseline, Goals, and Progress*

39.     In Reading, the December 2015 IEP states that B.D. "has demonstrated the ability to independently read a text then pinpoint the main idea of the story, as well as supporting details with little assistance.  When focused, [B.D.] is also able to answer basic comprehension

questions about a text." The IEP also includes data from a Brigance assessment that, as of

December 2015, put B.D. at a 5th grade level for Oral Reading; a 3rd grade level for Listening

Comprehension; and a 2nd grade level for Listening Vocabulary Comprehension, Reading

Vocabulary Comprehension , and Comprehending Short Passages.

40.     The December 2015 IEP created three annual goals in Reading. The first goal is

that "after independently reading a 3.5 grade level fiction or nonfiction text, [B.D.] will identify

the main idea and supporting details." The second goal is that "after independently reading a 3.5

grade level fiction or nonfiction text, [B.D.] will use a graphic organizer to identify and

summarize the beginning, middle, and end of the selection." The third goal is that "after

independently reading a 3.5 grade level fiction or nonfiction text, [B.D.] will independently

complete a labeled graphic organizer in response to 'What,' 'Who,' 'Where,' and 'When'

questions." The December 2015 IEP had no short term reading objectives.

41.     Progress toward these annual goals was to be measured through classroom

participation and classwork. FCPS was also required to send regular Progress Reports home to

track B.D.'s progress towards his short term objectives and annual goals.

42.     The June 2017 Proposed IEP simply states that B.D. has made "sufficient

progress in reaching his reading goals." However, it does not attempt to define what "sufficient"

progress would be or provide any data on B.D.'s purported growth. FCPS has provided no

data—and there are no data in the record—to back up this claim. FCPS failed to produce any of

the assessments given to B.D. based on the "Cars and Stars" reading program. All the school

produced was one year of "data"—which amounted to three number ratings for various reading

areas with no explanation for what those numbers mean. The November 2017 Educational

Assessment states that B.D.'s overall reading level was at grade 2.4—well below the goal of

grade 3.5 in the October 2015 IEP.  In fact, the Hearing Officer acknowledged that B.D. was

working towards the goal of reading at a 3.5 grade level, yet apparently ignored the November

2017 Educational Assessment when determining that B.D. has "consistently made meaningful

progress" in reading.  Decision Ex. 1, at 10.  That was error.

43.     This lack of growth was predictable based on the District's failure to implement

the services and accommodations provided in the December 2015 IEP.  Just like in math, his

English teachers failed to fill out B.D.'s assignment notebook as required in the IEP, leaving

B.D., his private tutor, and his parents in the dark about B.D.'s required work.  FCPS did not

properly track progress toward B.D.'s reading goals as required by the December 2015 IEP.

Again, to the extent FCPS sent out progress reports between 2015-2018, those reports did not

provide concrete data, and they often conceded that B.D.'s teachers sometimes did not attempt to

implement B.D.'s IEP goals at all.  Also as with math, B.D.'s progress often regressed from one

report to the next.  Those progress reports often did not include any meaningful data to

demonstrate B.D.'s growth.  Instead, they just included general, anecdotal statements even

though the IEP goals were supposed to be measured through specific work samples and testing

data.

44.     Moreover, the December 2015 IEP also eliminated a Developmental Reading

class that had been called for in B.D.'s middle school IEP and four hours per week—or 144

hours over the school year—of Special Education instruction time.  The bulk of that time was

taken away from reading instruction because instead of allowing him to take a Reading class in

his freshman and junior years, B.D. was forced to split his time in English class between both

reading and writing.  B.D.'s English teachers at Marshall consistently wasted instructional time,

further exacerbating this reduction in service hours.  For example, one of B.D.'s teachers, Mr.

Greene, testified that he would let B.D. watch videos on YouTube when B.D. was supposed to be working on reading skills during his Strategies for Success class.  Another teacher, Ms. Willis, who taught B.D. in a combined reading and writing class his freshman year, testified that she would use about one-third of class time on scheduled breaks for all students in the class, and in addition, she would often take "field trips" with the class to the restroom.  During one of Ms. Heffner's observations of the classroom, a restroom "field trip" lasted 37 minutes.  Accumulated over a school year, these gaping holes in instructional time deprived B.D. of his required Special Education service hours under his IEP.

45.    Unsurprisingly, based on the failure to provide appropriate opportunities for reading growth, the data show that, at best, B.D. made no growth in reading while at Marshall—a clear denial of FAPE.

*Writing Baseline, Goals, and Progress*

46.    In Writing, the December 2015 IEP states that B.D. enjoys writing but still struggled to form complete sentences and needs to work on relying on his tools such as the "Words to capitalize" checklist.

47.    The December 2015 IEP creates one annual goal in Writing, which states that B.D. "will use a variety of prewriting strategies to write a short report/story (7 or more sentences) with fading teacher prompts with an accuracy of 5 out of 7 sentences."  To ensure that B.D. could meet this annual goal, he was given short term objectives such as: (1) writing sentences with proper syntax; (2) writing sentences using correct capitalization with 75% accuracy; (3) writing sentences using correct punctuation; (4) using articles, prepositions, possessives, and pronouns correctly.

48.    Just like in math and reading, Marshall failed to implement B.D.'s IEP in the area of writing by neither implementing his goals nor providing the appropriate services and accommodations.  As with his math and reading teachers, his writing teachers failed to fill out B.D.'s assignment notebook as required in the IEP, leaving B.D., his private tutor, and his parents without the ability to track B.D.'s assignments and support his needs.  FCPS did not properly track progress toward B.D.'s writing goals as required by the December 2015 IEP. Again, to the extent FCPS sent out progress reports between 2015-2018, those reports did not provide concrete data, and they often conceded that B.D.'s teachers sometimes did not attempt to implement B.D.'s IEP goals at all.  Also like his other subjects, B.D.'s progress regressed from one report to the next.  In one glaring example, B.D.'s progress report claimed that he mastered the short term objective of using correct punctuation.  However, in the following progress report that skill has been reduced to "some progress."  B.D.'s writing progress reports did not include the data required by his IEP.  The IEP called for his goals to be demonstrated in three writing samples per quarter.  Although the progress reports were issued quarterly, they include almost no reference to these samples.  Evidently, the samples were not being produced in contravention of the IEP.

49.    The June 2017 Proposed IEP uses the exact same annual writing goal as the December 2015 IEP and indicates little progress toward that goal.  To be sure, the June 2017 Proposed IEP reports that B.D. has shown an "increasing ability" to accurately capitalize words and that B.D. can "use basic punctuation such as periods, exclamation points and question marks correctly with 90% accuracy."  However, this shows that B.D.'s only demonstrated progress over the course of two years was in punctuation and capitalization.  The record does not suggest that he made any meaningful progress towards his goal of writing reports and stories,

notwithstanding his ability, as of 2015, to write paragraphs using graphic organizers, among other things.  This reflected FCPS's bad faith efforts towards implementing the goals, services, and accommodations recited in B.D.'s IEP.

50.     Despite this clear record of minimal progress and failure to implement B.D.'s IEP, the Hearing Officer once more found that B.D. "consistently made meaningful progress" in Writing.  Decision Ex. 1, at 15.  This conclusion was plainly incorrect, and the school division plainly did not provide B.D. with FAPE.

*Speech and Language Baseline, Goals, and Progress*

51.     For Speech and Language, B.D.'s December 2015 IEP states that:

[B.D.] is able to produce his sounds accurately and his speech is much more intelligible.  During these times, [B.D.] produces /ch/ with 85% accuracy, /sh/ with 96% accuracy, /n/ with 100% accuracy, /r/-blends with 100% accuracy, /s/ with 95% accuracy, and /z/ with 80% accuracy, all at the word level or in shorter utterances. When participating in a 1:1 conversation with the speech clinician, [B.D.] has begun to utilize strategies to use appropriate rate and phrasing, given 1 or more prompts/visual cues (e.g., pacing board, voice recording).  He has also begun to self-correct his speech when he notices that he did not modify his intonation.

52.     The December 2015 IEP creates two Speech and Language annual Goals.  The first goal is that B.D. "will independently produce target phonemes (ex: /th/, /ŋ/(ng), /ch/, /sh/, /j/, /s/, /z/, /r/, /tr, kr, gr/) and maintain /n/, /br, fr, pr/ in multisyllabic words in phrases and sentences (e.g., oral reading, structured conversation, spontaneous conversation), in 80% of opportunities." The second goal is that B.D. will "utilize intelligibility strategies (e.g. use appropriate rate/phrasing/intonation, overarticulation, etc.) in multisyllabic words in phrases and sentences (e.g., oral reading, structured conversation, spontaneous conversation) in 80% of opportunities." B.D.'s short term objectives for this goal are to adjust his intonation to express meaning and adjust his rate of speech to express meaning in structured conversations.

53.     FCPS's speech therapist, Dr. Gilligan, acknowledged in her testimony that she stopped working on B.D.'s articulation and the reciprocal communication aspects of his IEP goals.  Instead, she began to implement her own goals that she created for a Proposed IEP. Those goals did not address B.D.'s needs as laid out in his December 2015 IEP.  Dr. Gilligan began implementing these goals in 2017 despite the fact that she had yet to record in B.D.'s progress reports that he had mastered both of his old goals.

54.     Based on the June 2017 Proposed IEP, B.D. has made some progress in the area of Speech and Language.  However, FCPS has failed to implement the Speech and Language services provided in the IEP as shown by Dr. Gilligan's testimony.  This is why B.D.'s parents have paid—out of pocket—over $4,000 for private, one-on-one speech and language therapy for B.D. Thus, to the extent B.D. has made progress on his speech and language IEP goals, that progress area can be attributable to the Parents' expenditure (which should be covered by the school), not by the school division's faithful provision of FAPE.

*Additional Issues*

55.     Beyond the failure to provide appropriate academic growth, B.D.'s career at Marshall has been punctuated by negative interactions.  This primarily has manifested itself in FCPS's efforts to derail B.D. from his goal to graduate with a Standard Diploma, which as noted above is an explicit goal recited in the December 2015 IEP.  In order for B.D. to receive a Standard Diploma, he would have to take and pass the SOLs, Virginia's high-stakes standardized test.  In a June 6, 2016 IEP meeting, Procedural Support Liaison Madonna Aldrich stated that B.D. would take the SOLs to meet the requirements of the Standard Diploma.  She also stated that B.D. does not meet the criteria for Virginia's alternative assessment, which is not part of the Standard Diploma track, because his cognitive disability is not "significant."  B.D. had and

continues to have many options for accommodations so that he can have a realistic chance of passing the SOLs on his way to a Standard Diploma, but FCPS has failed to properly explore and explain these options.  To the extent that FCPS has explored these options, it has done so laughably late in B.D.'s high school career.  In that June 2016 IEP meeting, despite Ms. Aldrich's statements, Principal Litz simply told B.D.'s parents that B.D. taking the SOLs would be "difficult," and the team put off discussing accommodations until SOL testing was completed, which would not occur until the end of the following school year.  But, that discussion never happened because Marshall refused to allow B.D. to take any SOLs in 2017.  In fact, B.D. has only taken three SOLs during his time at Marshall; one in Biology, one in World History, and one in Virginia/U.S. History.  This is despite the fact that a Standard Diploma requires that a student pass six SOLs, including SOLs in Math and English.

56.      It was not until an IEP meeting on January 10, 2018, halfway through B.D.'s junior year and after the Parents filed their Due Process Complaint, that FCPS finally brought up the fact that B.D. could receive credit accommodations or take a "work keys" assessment to help him progress towards a Standard Diploma.  The school told B.D., who was at the meeting, and his Parents that those options would allow him to get credit for classes without passing the SOLs. The credit accommodations would require a score of 375 on the SOLs—instead of the normal passing score of 400.  B.D. had been on the cusp of scoring a 375 on his previous SOLs.  For example, in his most recent Math SOL that he took in 8th grade, prior to arriving at Marshall, he scored a 335.  B.D. only needed to increase his Math score 12% to hit 375 and receive credit accommodations.  However, he was never given that opportunity because Marshall has never allowed B.D. to take an SOL in Math—or English for that matter.  Without an opportunity to take the SOLs, B.D. had no feasible way to meet his IEP goal of a Standard Diploma.

57.     Additionally, since the Hearing Officer issued her decision, FCPS has now taken B.D. out of curriculum classes for students with learning disabilities that teach SOL material, and placed him in self-contained Special Education classrooms for students with intellectual disabilities that do not teach SOL material.  The Parents never consented to B.D.'s removal from curriculum classes and placement in a more restrictive environment.  Without access to curriculum classes, B.D.'s path to a Standard Diploma is impossible.  FCPS has failed to provide FAPE by derailing B.D.'s chances at attaining a Standard Diploma—a requirement in his IEPs since 2013—and due to its abject failure to even facilitate B.D.'s progress toward the IEP goals established in the 2015, stay-put IEP.

58.     FCPS has impeded the Parents' ability to participate in the decision-making process regarding the provision of FAPE and educational services to B.D.  The Parents have been vocal about their son's rights as a student with a disability, and in return, they have been shut out of the process.

59.     When B.D. was an incoming freshman, Mr. Litz, Marshall's principal, initially refused to allow B.D. to transfer into Marshall.  B.D. had sought placement at Marshall because his siblings attended the International Baccalaureate program there—a typical reason for students to transfer.   After sending a timely application, B.D. was denied by Mr. Litz.  Eventually, after advocacy by the Parents, Mr. Litz's decision was overruled by FCPS's Regional Assistant Superintendent's office, and B.D. was allowed to attend Marshall.

60.     Unfortunately, the animus shown in that lack of welcome continued to manifest itself in the Parents' future interactions with Mr. Litz.  In 2015, Mr. Litz refused to allow Ms. Heffner to visit and observe her son's full class period—even though FCPS regulations state that "[p]rincipals and teachers shall welcome the routine visits of patrons of the schools."  Ms.

Heffner eventually gained permission for an observation after reaching out to district administrators and school board officials.  When she was finally granted the opportunity to observe, Ms. Heffner recorded additional evidence of FCPS's failure to provide B.D. with FAPE.

61.     Another troubling incident occurred early in the 2017 school year.  After Ms. Heffner raised concerns with teachers and staff at Marshall about B.D.'s class schedule, Mr. Litz banned Ms. Heffner from further communications with B.D.'s teachers.  Specifically, on September 15, 2017, Mr. Litz sent Ms. Heffner an e-mail stating that she could no longer communicate with any employees at Marshall.  She would only be allowed to communicate with him, and only he would provide responses.  Regrettably, without the ability to communicate with B.D.'s teachers, Ms. Heffner was unable to provide the parental support she is entitled to under the IDEA.  She was punished for being an advocate for her disabled child.

62.     B.D. and his parents experienced further retaliation for the Parents' advocacy early in the 2017 school year.  B.D. wanted to participate in Theater Arts.  He and his Parents viewed Theater Arts as an opportunity for B.D. to engage with his interest in music as laid out in the Transition Goals section of his December 2015 IEP.  When B.D. tried to sign up, he was rejected by the instructor, who felt that B.D. could not participate due to his Down syndrome diagnosis.  B.D. and his Parents tried to come up with solutions with administrators so that B.D. could be involved, including behind-the-scenes and off-stage roles (similar, perhaps, to B.D.'s role as the manager of Marshall's basketball team), but to no avail.  Mr. Litz rejected Plaintiffs' ideas, citing unspecified "safety concerns."  The Parents later learned that B.D. could easily have been reasonably accommodated to pass the required safety test and participate in Theater Arts. The failure to accommodate B.D. in a behind-the-scenes or off-stage role in Theater Arts was further retaliation for his Parents' advocacy.

63.     In response to these behaviors by the staff at Marshall and Mr. Litz, Ms. Heffner

sought and was granted a request pursuant to the Family Educational Rights Act (FERPA) to see

school records from Marshall—including e-mails.  One e-mail contained the following statement

by Mr. Litz in reference to Marshall's SOL scores: "Algebra went up 3% from last year.  Makes

me sad when I think of what could have been without the terrible SPED."  The term "SPED"

stands for "Special Education."[4]  Marshall's most recent SOL data shows that the pass rate for

students with disabilities in Math was a meager 52 percent.  Special Education students seeking

the Standard Diploma are required to take the SOLs, and unfortunately tend to pass at lower

rates—on average—than their non-disabled peers.  FCPS school rankings depend, in part, on

these test scores.  SOL scores are publicly available and receive intense scrutiny from

administrators and parents.  Marshall is an International Baccalaureate school and has a high

SOL pass rate—typically well over 90% of students pass.[5]  On the other hand, the pass rates for

students with disabilities at Marshall have averaged around 73% over the past three years.  B.D.

has the potential to pass the SOLs, as laid out in IEP after IEP, however, for B.D. to have an

appropriate opportunity to pass he requires proper accommodations, strong educational services,

and dedication from staff.  FCPS was unwilling to provide those appropriate services and instead

simply has not allowed B.D. to take the necessary SOLs, essentially forcing him to miss out on

an opportunity at a Standard Diploma.  They did this while simultaneously failing to explain to

B.D. and his Parents that credit accommodations were available and alternative testing was an

---

[4] During the Due Process Hearing, Mr. Litz claimed that he was "talking about the terrible special education teacher whose scores that year were very poor."

[5] For reference, the latest Virginia Department of Education School Snapshot shows statewide SOL pass rates of 79% and 77% for reading and math respectively.

option, which could both enable B.D. to obtain the credits he needed to graduate with a Standard

Diploma.

*Procedural History and Subsequent Actions by FCPS*

64.     After the lack of academic progress and the failure of FCPS to faithfully

implement B.D.'s IEP for over two years, B.D.'s parents felt they had no choice but to file a Due

Process Complaint.  On October 4, 2017, the Parents filed their original Due Process Complaint.

On October 20, 2017, the Parents filed their Amended Complaint.  On November 29, 2017, the

Parents filed a further Request for Due Process Hearing that then became the Parents Second

Amended Complaint.  And on February 22, 2018 the Parents filed their Third Amended

Complaint.  The Parents' Third Amended Complaint claimed that FCPS had denied their son

FAPE during the previous school years—beginning on October 4, 2015, two years prior to the

original Complaint.  They also made numerous other specific claims for relief.  FCPS denied the

Parents' claims.

65.     On May 1, 2018, the Hearing Officer began the Due Process Hearing. The hearing

lasted six days.  On August 28, 2018, the Hearing Officer issued the Decision in favor of FCPS.

In the Decision, the Hearing Officer stated that the case had raised three issues: (1) whether the

December 2015 IEP provided FAPE; (2) whether FCPS provided B.D. with FAPE for the 2015-

2018 school years; and (3) whether FCPS's Proposed IEPs would provide FAPE.

66.     The Hearing Officer held that the December 2015 IEP met FAPE and that FCPS

had provided FAPE to B.D. from 2015-2018, largely based on the generic and conclusory

testimony of FCPS staff.  Additionally, the Hearing Officer held that FCPS' Proposed IEPs met

FAPE, again primarily based on FCPS's self-serving testimony and nothing more. Additionally,

the Hearing Officer ignored all of the hard data laying out B.D.'s lack of academic progress and

regression, especially in math, reading and writing, opting instead to describe B.D.'s progress in

vague generalities.  Instead of reaching the result required by law—that FCPS had failed to

provide B.D. an opportunity to make appropriate progress—the Hearing Officer rubber-stamped

the District's proffered evidence.  The Hearing Officer did not discuss FCPS's failures to

implement B.D.'s 2015 IEP by not providing appropriate accommodations and failing to

adequately track his achievement levels; and the Hearing Officer declined to hear broad swaths

of evidence that underscored B.D.'s potential and capability for growth when he entered

Marshall.[6]  Moreover, the Hearing Officer declined to accord meaningful weight to both B.D.'s

parents' testimony and the testimony of the expert B.D.'s parents relied upon, notwithstanding

the relevance of that testimony.  The Hearing Officer's findings of fact violate the accepted

norms of the fact-finding process and are not entitled to due weight.

67.     Even if all of the Hearing Officer's factual conclusions were given due weight,

those facts—when compared to the December 2015 IEP baseline—demonstrate that B.D. was

not provided FAPE as a matter of law.  There was no evidence in the record of even de minimis

progress that could support the Hearing Officer's decision, let alone the reasonable progress

required to provide FAPE.

68.     Lastly, the Hearing Officer's holding that FCPS's Proposed IEPs provided FAPE

was erroneous. The Hearing Officer improperly allowed the District to raise the Proposed IEP

issue for the first time in its closing statement.  The Hearing Officer heard no evidence on the

issue, and the Parents were not on notice of the issue during the Due Process Hearing.

Regardless, the Proposed IEPs fail to provide FAPE as a matter of law because they create

---

[6] The Hearing Officer disallowed any evidence that took place prior to the two-year statute of limitations period.
Thus, the Parents were unable to present any evidence of B.D.'s middle school progress and baseline.

standards below those set in the December 2015, and thus are irrelevant to the claim raised by the Parents.

69.     Based on the Hearing Officer's Decision, FCPS has now chosen to implement its favorite Proposed IEP upon B.D. for the 2018-2019 school year despite the lack of parental consent.  Among other differences from the December 2015 IEP, the Proposed IEP removes B.D. from the Standard Diploma track and cuts related service hours

**COUNT ONE**
**(Individuals with Disabilities Education Act: Failure To Provide Free Appropriate Public Education)**

70.     Plaintiffs incorporate the previous paragraphs into this Count.

71.     The Hearing Officer committed legal error and reached factual conclusions that violated accepted norms of the fact-finding process when she held that the December 7, 2015 IEP provided FAPE and that the District has provided B.D. with FAPE from December 7, 2015 through May of 2018.

72.     The Hearing Officer inappropriately held that the Defendant's proposed IEPs would provide FAPE, even though that issue had not been brought through a Due Process complaint by the District.  Thus, the Hearing Officer improperly shifted the burden of proof to the Parents for an issue raised by the District.

73.     The Hearing Officer committed significant procedural errors by failing to accord weight to the testimony of B.D.'s parents and certain educational experts, and likewise committed error by excluding broad swaths of evidence that were relevant to a proper determination of whether B.D. received FAPE.

74.     Now, the District has imposed its latest Proposed IEP upon B.D. without the

Parents' consent. Thus, the District continues to deny B.D. FAPE and violate the procedural

protections under the IDEA.

## COUNT TWO
### (Section 504 of the Rehabilitation Act: Discrimination)

75.     Plaintiffs incorporate the previous paragraphs into this Count.

76.     Defendant failed to provide appropriate educational services to B.D., a student

with a disability.  B.D.'s disability was the sole reason for this discrimination.

77.     Defendant acted in bad faith by failing to provide educational benefits and

services to B.D.

78.     Defendant acted in bad faith by failing to provide procedural due process to

B.D.'s parents to facilitate the school's implementation of B.D.'s IEP, and did so on the basis of

B.D.'s disability.

## COUNT THREE
### (Section 504 of the Rehabilitation Act: Retaliation)

79.     Plaintiffs incorporate the previous paragraphs into this Count.

80.     The Parents undertook a protected activity by advocating for B.D., a student with

a disability.

81.     Defendant took adverse actions against B.D. by, among other things, cutting off

Parents' communication with B.D.'s teachers and school staff and preventing B.D. from

participating in Theater Arts.

82.     Defendant's adverse action was caused by Parents' protected activity of

advocating for B.D.

**COUNT FOUR**
**(Americans with Disabilities Act: Discrimination)**

83.     Plaintiffs incorporate the previous paragraphs into this Count.

84.     Defendant failed to provide appropriate education services to B.D., a student with a disability.  B.D.'s disability was a motivating factor for this discrimination.

85.     Defendant acted in bad faith by failing to provide educational benefits and services to B.D.

86.     Defendant acted in bad faith by failing to provide procedural due process to B.D.'s parents to facilitate the school's implementation of B.D.'s IEP, and did so on the basis of B.D.'s disability.

**COUNT FIVE**
**(Americans with Disabilities Act: Retaliation)**

87.     Plaintiffs incorporate the previous paragraphs into this Count.

88.     The Parents undertook a protected activity by advocating for B.D., a student with a disability.

89.     Defendant took adverse actions against B.D. by, among other things, cutting off Parents' communication with B.D.'s teachers and school staff and preventing B.D. from participating in Theater Arts.

90.     Defendant's adverse action was caused by Parents' protected activity of advocating for B.D.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request as follows:

A.  Accept jurisdiction over this matter;

B.  Hear additional evidence as appropriate pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

C. Reverse the Hearing Officer's decision and hold that:

    a. Since October 4, 2015, two years prior to the Parents' original Complaint, the District did not provide a free and appropriate public education to B.D. during the 2015-2016, 2016-2017 and 2017-2018 school years.

    b. The Hearing Officer's finding that the District's Proposed IEPs would provide B.D. with a free appropriate public education was erroneous;

D. Enjoin the District from imposing and implementing its Proposed IEP;

E. Award compensatory education to B.D.;

F. Award reimbursement for B.D.'s private speech and language therapy and tutoring services;

G. Award monetary and punitive damages under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

H. Award Plaintiffs all costs and reasonable attorneys' fees incurred in connection with this action and the Due Process action;

I. Provide a total award in excess of $250,000; and

J. Such other and further relief as the Court deems necessary and appropriate.

Dated: November 16, 2018

Respectfully submitted,

/s/ J. Andrew Keyes_____

J. Andrew Keyes (Va. ID No. 37972)
Christopher Suarez (*pro hac vice* pending)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  202-434-5000
Facsimile:  202-434-5029
akeyes@wc.com
csuarez@wc.com

*Attorneys for Plaintiffs B.D., Yvonne Heffner,
and Steve Jones*